Filed 4/8/16  P. v. Armstrong CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE, | B258639 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA420534) |
| v. | |
| JOHN ARMSTRONG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed in part, modified in part, and reversed in part with directions.

Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Michael J. Wise, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury found defendant and appellant John Armstrong guilty of second degree murder. (Pen. Code, § 187.)[1] It found true the special allegation that Armstrong committed the murder while engaged in the crime of robbery within the meaning of section 190.2, subdivision (a)(17), and that the murder was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).)

The trial court sentenced Armstrong to 15 years-to-life in prison, plus 10 years for the gang allegation. The court stated that it was imposing and staying sentence on the robbery-murder special circumstance, but did not pronounce a sentence.

Armstrong contends that: (1) insufficient evidence supports his conviction; (2) the trial court erred in failing to sua sponte instruct the jury on voluntary and involuntary manslaughter as lesser included offenses of murder; (3) admission of testimony from the preliminary hearing for codefendant Curtis Deshawn Lowe's 1990 manslaughter conviction violated Armstrong's constitutional rights to due process and a fair trial; (4) the prosecutor committed misconduct during closing argument; (5) he was prejudiced by cumulative error at trial; (6) the jury's true finding on the robbery-murder special circumstance must be stricken; and (7) the abstract of judgment must be corrected to reflect that direct victim restitution fines and burial costs are payable jointly and severally with codefendants Lowe and Sedric Wayne Scott.[2]

We agree with Armstrong that the jury's true finding on the robbery-murder special circumstance must be stricken because it is inapplicable as a matter of law to a second degree murder conviction, and that the abstract of judgment must be amended to reflect that the $5,000 in direct victim restitution fines and burial costs imposed are

---

[1] All future references are to the Penal Code unless otherwise stated.

[2] Armstrong, Lowe, Scott, and Nathaniel Willard were tried jointly. Lowe and Scott have a separate direct appeal pending in case number B260127. The trial court granted Willard's request for dismissal pursuant to section 1118.1. Subsequent to his dismissal from the case, Willard testified for the prosecution.

payable jointly and severally with codefendants Lowe and Scott, but otherwise affirm the judgment.

## FACTS

**Prosecution**

<u>The Murder of Patrick Lister</u>

On May 14, 2012, Armstrong and Scott, members of the Swans criminal street gang, were standing in front of the Three Star Market with several other Swans members, including Nathaniel Willard and Mitchell Johnson. Patrick Lister was walking toward the market, when Scott and Armstrong "hit him up" and asked him "where he was from." Lister did not respond. He walked past Scott and Armstrong and entered the market. They followed Lister into the market and confronted him just inside the doorway. Scott tore a gold chain from Lister's neck and ran out of the market, taunting him. Lister pursued Scott with his arms extended. Scott threw a punch at Lister. Armstrong ran over and punched Lister. Scott pocketed the chain. A group of Swans members surrounded Lister and began beating him.

Lowe was not present when the incident started. He ran from across the street and joined the group surrounding Lister after the altercation began. Lowe's sister Keisha came out of a laundromat behind the market and saw the men beating Lister. She recognized Lister as the brother of her close childhood friend. Keisha grabbed Lowe by the neck and yelled, "What are you all doing? That's Veronica's brother." She told the gang members to get off of Lister, and the group broke apart. Scott returned the chain to Lister. Keisha saw blood on Lister's shirt and told him he was "leaking." Keisha saw that Lister's chest was covered in blood.

Lister died on May 17, 2012, from a six-inch deep stab wound to the left side of his chest that pierced his heart. The wound would have required the use of significant

3

force. Lister also sustained a three-inch deep nonfatal stab wound to his lower back. There were no defensive wounds to his hands. Lister was 5 feet 9 inches tall, and his weight was estimated at approximately 170 to 180 pounds.

Officers recovered a gold chain with a broken clasp from Lister's car.

Surveillance Video

Portions of the attack on Lister were recorded on the market's video surveillance cameras. Defendants stipulated that they were depicted in the videos. The videos showed numerous Swans members at the scene, including Armstrong, Scott, Willard, and Johnson, greeting one another and shaking hands. The videos displayed Armstrong and Scott approaching Lister. Scott is shown ripping the chain and running away while holding it over his head. Lister is seen chasing him, with his arms extended toward the chain. Scott throws a punch in Lister's direction, and then shoves the chain into his pocket. Armstrong also throws a punch in Lister's direction, and then all three men move out of camera range.

Moments later, Lowe is shown walking into view from the direction of the fight.[3] He moves something from his left hand to his right hand, puts it in his pocket, and goes into the market. Scott, Armstrong, and Willard then appear on camera, coming from the same direction as Lowe. A man wearing blue walks toward the market. At the entrance, he and Armstrong talk and shake hands. As the man starts to go into the market, Lowe walks out and pokes him in the chest, pushing him back. Armstrong puts his arm out straight across Lowe's arms and chest as Lowe advances toward the man in blue. Armstrong says something to Lowe, and the two bump hands in a friendly manner. Lowe walks back into the market, followed by the man in blue. While standing below the inside camera, Lowe opens his right palm and looks down at it. Armstrong and Lowe leave the market together talking in a friendly manner, and disappear from view.

---

[3] The stabbing was not depicted in the recording.

4

<u>Witnesses</u>

The police arrested Willard[4] on June 8, 2012. In a recorded conversation, which was played for the jury, Willard admitted to a confidential informant that he had been present at the incident. Willard stated that he was a Swans member and he saw the fight between Scott and Lister. Lowe stabbed Lister, and Armstrong was also involved. Scott returned the chain to Lister when the fight ended. He saw Lister bleeding from the stabbing. Officers interviewed Keisha and Johnson. Johnson stated that "Everybody out there [at the market was] from Swans." He saw Scott and Armstrong fighting Lister. Johnson said that Lowe stabbed Lister, but he did not actually see the stabbing. When Johnson got off the school bus that day, Lowe flashed a "little palm knife" that flipped open. It was "a little bit longer" than five inches. Lowe did not just show the knife to Johnson; he showed it to "everybody."

<u>Expert Testimony</u>

Los Angeles Police Department Gang Enforcement Officer Bobby Romo testified regarding the Swans criminal street gang, a Bloods gang with over 400 active members. The Swans members primarily wear red. Their symbol is a swan. They have a rivalry with the Crips, who wear blue. Swans' primary activities include murder, assault with a deadly weapon, vandalism, and criminal threats.

Gangs commit crimes such as shootings, robberies, and tagging to foster fear and respect from the community and rival gangs. Individual members will commit crimes and acts of violence to gain status within the gang. Gangs are territorial. If a rival gang member enters a gang's territory, gang members will ask where he is from to verify his gang affiliation. Rival gang members can be killed for entering a gang's territory. The

---

[4] Willard was called as a witness by the prosecution after the charges against him were dismissed pursuant to section 1118.1.

5

Three Star Market was on the "main threshold" of Swans territory. Swans members congregated in the area frequently.

Based on tattoos, admissions, and their habits and associations, Officer Romo opined that Scott, Lowe, Armstrong, and Willard were members of the Swans gang. Given a hypothetical tracking the facts in this case, Officer Romo opined that the murder would have been committed for the benefit of, at the direction of, and in association, with the gang. The gang members worked in concert. One of them robbed the victim, which would bolster his own reputation. The gang would view the victim as showing disrespect when he challenged the robber and tried to get his property back. The others backed up the robber by participating in the assault, which would be expected of members of the same gang to protect the gang's reputation.

Detective Everardo Amaral was assigned to the Los Angeles Police Department's Criminal Gang Homicide Division. He had been an officer for 16 years at the time of the trial, and had extensive gang training, including training to identify gang members. Detective Amaral was the primary investigating officer in the case. He identified defendants in the video. Detective Amaral testified that, according to booking photos, Scott was 5 feet 7 inches tall and weighed 130 pounds at the time of his arrest.

**Defense** [5]

Scott

Scott testified that he had suffered three prior convictions involving weapons possession. In two of the incidents, he gave false names to the arresting officers.

Scott had been an active member of the Swans gang since high school. Scott testified that Armstrong was a Swans gang member who went by the gang moniker "Biscuit." Mitchell Johnson was a Swans gang member who went by the moniker

---

[5] Armstrong did not testify in his own defense.

6

"Jack." Willard was also a Swans member. Scott was not friends with Willard and Armstrong because they were older than he.

On May 14, 2012, Scott walked to the Three Star Market with his friend Randy. He was waiting for Randy outside the store when he saw Lister at the entrance. Scott had seen Lister around other members of the Swans gang. Lister was acting and speaking strangely, but was not addressing anyone. Lister stepped inside and faced Scott. Scott said, "Why are you tripping? Why don't you leave." Lister responded, "Fuck you, man. We can do whatever." Scott reached to pull Lister out of the store and touched his chest. He was trying to grab Lister's shirt to make him leave. Lister extended his arms and came at Scott. Scott backed up and swung at Lister. He was afraid that Lister was going to hit him.

Scott admitted that he and Armstrong approached Lister first, and that Armstrong was trying to hit Lister. Scott "accidentally" broke Lister's chain, but he gave it back to him and walked away. Lister was not bleeding when Scott returned the chain. When Scott left, Lister was trying to put the chain back on.

Scott did not see Armstrong punch Lister until he viewed the market's video surveillance footage. Scott left after the confrontation. He did not know Lister was stabbed and did not know who stabbed him. Scott did not know Lowe. The first time he saw Lowe was on the surveillance footage.

Scott did not steal Lister's gold chain for the benefit of the Swans gang and did not have a prearranged plan with the other defendants to steal Lister's chain or kill him. The Swans were peaceful. He did not know of any violence between the Swans and Crips gangs. He did not know of any Swans gang member who carried a gun or a knife. Asking someone on the street "Where you from?" was not threatening, but was just "a way to get to know someone."

Lowe

Lowe has numerous felony convictions, including a conviction for voluntary manslaughter committed while he was a Swans gang member in May 1990. An individual named Kenneth Solomon was involved in a fight with 9 to 10 Swans gang members. According to Lowe's testimony, Lowe threw a brick during the fight, which struck Solomon on his head and killed him. Lowe did not intend to kill Solomon. He pled guilty to voluntary manslaughter and served five years in prison for the offense.

The prosecution was permitted to impeach Lowe with the preliminary hearing testimony of Willie Mae McGowan relating to the killing of Solomon. According to the prior testimony, McGowan and Solomon drove to the vicinity of 839 78th Street in Los Angeles to buy drugs. When they arrived there were approximately 9 to 10 people present. Solomon asked, "Who has the snow?" Lowe's codefendant, Keith Walker, told Solomon he would have to get out of the car and come over because there were police in the area. The man who Solomon was supposed to meet walked over to him, punched him in the stomach, and said, "This is swan." McGowan believed the man was referring to the Swans gang. Someone said, "Give up the dove," and everyone in the group moved toward Solomon and began beating him. Solomon fell to the ground after being struck with a flowerpot. Another person said, "Let's kill this mother fucker." Lowe picked up a very large brick and walked over to Solomon. McGowan yelled, "Please don't kill him." Lowe raised the brick up and slammed it down on Solomon's head. The force was so great that it caused Solomon's body to "jump off the ground." Walker pulled off Solomon's jacket, which had $200 in it. Some of the men were touching Solomon's pants pockets. McGowan believed Solomon was dead, so she drove away.

Lowe further testified that he had not been involved with the Swans since 1990. He had multiple tattoos, including a tattoo of a "B," which did not mean anything; he just liked Boston. He had a tattoo of a swan on his arm to memorialize his dead wife. The tattoo had nothing to do with the Swans gang. In 1996, after he was released from prison,

8

Lowe moved from Los Angeles to Rialto, although he used his mother's address in Los Angeles for his parole officer.

Lowe was at the Three Star Market on May 14, 2012. He did not know Lister, Willard, Scott, or Armstrong, did not fight with Lister, did not see anyone else fight with or stab Lister, and did not kill Lister. Keisha never touched Lowe on the day of the incident, nor did she pull him away from a group of people. While in the market, Lowe pushed a man wearing blue with his right hand after the man had made a remark about his niece or sister.

Lowe testified that the surveillance video showed him taking a "cell phone" from his right hand and putting it into his left hand outside the store. Lowe was left-handed and had "limited mobility" in his right arm due to injuries. He did not have the strength to stab anyone with his right arm, and was not carrying a knife or any other weapon that day.

Rebuttal

Homicide investigator Dean Vinluan had investigated 25 gang-related homicides, two of which involved members of the Swans gang. Several of the cases involved fights that escalated into deadly violence. Gang members settle their disputes more violently than other people.

**DISCUSSION**

**Sufficiency of the Evidence**

Armstrong contends his conviction for second degree murder must be reversed, because there was insufficient evidence that the stabbing was a natural and probable consequence of a simple assault and battery. He argues that because he and Lowe did not know one another, and Lowe was not present when the altercation started, a reasonable

9

person would not have foreseen that a murder by stabbing was a natural and probable consequence of a "'beat down' of Lister." Armstrong argues that Lowe acted independently in a manner that was unforeseeable. We are not persuaded.

Law

"In considering an appellate challenge to the sufficiency of the evidence, state law requires this court to 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Under the due process clause of the Fourteenth Amendment, an appellate court must 'determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 318.) The reviewing court does not address whether it believes the evidence established guilt beyond a reasonable doubt. 'Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]'" (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1411-1412.)

"All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (§ 31.) "[A] person [directly] aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) "[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.'

10

[Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

Discussion

Substantial evidence supports the jury's finding that Lister's murder was a natural and probable consequence of the assault and battery. Armstrong concedes that he is a Swans gang member and that he committed an assault and battery against Lister. Armstrong and Lowe were members of the same gang and shared a common purpose in attacking Lister. Lowe admitted that he belonged to the Swans gang when he murdered Solomon in 1990. Officer Romo opined that based on tattoos, admissions, and his habits and associations, Lowe was a Swans member. Minutes after Lister was stabbed, Lowe was shown on video shoving a man dressed entirely in blue, the color of the rival Crips gang, conduct consistent with that of an active Swans member. Johnson testified that Lowe backed off after Armstrong held him back and told him that the man in blue was from a friendly gang—an additional indication that Lowe was a Swan and knew that Armstrong was as well. The Three Star Market was within Swans gang territory and was a known hangout for Swans members. The surveillance footage showed numerous Swans members, including Willard, Scott and Armstrong, gathered in front of and just inside the market, greeting each other and hanging out. The evidence tends to show that Lowe was a Swans member, and that he likely knew that Armstrong and Scott were Swans as well.

Armstrong does not challenge the jury's finding that he acted for the benefit of a criminal street gang pursuant to section 186.22, subdivision (b)(1)(C). Officer Romo testified that the primary activities of the Swans include murder and assault with a deadly weapon. Gang members back each other up in a fight to protect the reputation of the gang and to boost their own status within the gang. It was reasonably foreseeable that

11

one of the many fellow Swans members who frequented the market would join the fight to back up Armstrong and Scott. Given the gang's primary activities, it was also reasonably foreseeable that whoever rendered aid would be armed with a deadly weapon and that murder could result as a natural and probable consequence of the assault and battery. Substantial evidence supports the second degree murder conviction.

**Involuntary and Voluntary Manslaughter Instructions**

Armstrong contends that the trial court erred in failing to sua sponte instruct the jury on the lesser included offenses of voluntary manslaughter based on a sudden quarrel or heat of passion, and involuntary manslaughter based on an unintentional killing occurring during the commission of an assault and battery. We conclude that the trial court did not err, nor has Armstrong established prejudice.

Law

"'A trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." [Citation.]' . . ." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824; see *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) This obligation includes the duty to give instructions on lesser included offenses. (*Ibid*.) "Both voluntary and involuntary manslaughter are lesser included offenses of murder." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.) In a murder case, the trial court must instruct on these lesser included offenses, if there is substantial evidentiary support for them. (*Breverman*, *supra*, at p. 160.) We review de novo the claim that a trial court failed to properly instruct the jury on the applicable principles of law. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

In determining whether substantial evidence exists to support an instruction, trial courts should not usurp the jury's function of evaluating the credibility of witnesses. (*Breverman*, *supra*, 19 Cal.4th at p. 162.) Substantial evidence means, in this context,

12

"""evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"" that the lesser offense, but not the greater, was committed. [Citations.]" (*Ibid*.) Speculation is insufficient to require the giving of an instruction on a lesser included offense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.)

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) "Malice is presumptively absent when a defendant kills 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)). . ." (*People v. Cruz* (2008) 44 Cal.4th 636, 664.) "[R]egardless of the manner an act of involuntary manslaughter is committed, the killing *must* be unintentional." (*People v. Dixon* (1995) 32 Cal.App.4th 1547, 1556.)

Discussion

Voluntary manslaughter under a heat of passion theory requires both provocation and heat of passion. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708 (*Gutierrez*).) "'First, the provocation which incites the [perpetrator] to act in the heat of passion case must be caused by the victim or reasonably believed by the accused to have been engaged in by the [victim]. [Citations.] Second, . . . the provocation must be such as to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.' (*People v. Lujan* (2001) 92 Cal.App.4th 1389, 1411-1412.)" (*Gutierrez*, *supra*, at pp. 708-709.) "The test of adequate provocation is an objective one. . . . The provocation must be such that an average . . . person would be so inflamed that he or she would lose reason and judgment. Adequate provocation and heat of passion must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60, citing *People v. Sedeno* (1974) 10 Cal.3d 703, 719; *People v. Williams* (1969) 71 Cal.2d 614, 624.) """[N]o specific type of provocation [is] required . . . ."" [Citations.] Moreover, the passion aroused need not be anger or rage, but can be any """[v]iolent, intense, high-wrought or enthusiastic emotion"""" [citations] other than revenge [citation]." (*Breverman*, *supra*, 19 Cal.4th at p. 163.)

13

Armstrong argues that "the combination of Lister's size and the physical altercation between Lister and Scott, which Scott testified was initiated by Lister" was sufficient evidence of provocation to support a voluntary manslaughter instruction. We disagree.

In every version of the evidence presented at trial, Scott instigated the altercation with Lister. According to Scott's testimony, which is the most favorable to Armstrong, Scott initiated both the verbal and physical contact with Lister. Scott testified that he spoke to Lister first, strongly suggesting to Lister that he leave the market. Scott then reached out to remove Lister from the market, and touched his chest, accidentally breaking the chain Lister was wearing. In response, Lister extended his arms, and came at Scott. Scott took a swing at Lister. At that point, Armstrong joined in the altercation and hit Lister. Lister had not hit Scott prior to Armstrong's intervention.

These circumstances would not cause "'an ordinary person of average disposition to act rashly or without due deliberation and reflection.' [Citation.]" (*Gutierrez*, *supra*, 112 Cal.App.4th at p. 709.) There was no evidence that Lister touched Scott in any way before Armstrong joined the altercation. Scott feared Lister would hit him, but he did not claim that Lister struck him, and Lister was not shown hitting Scott in the surveillance videos. "'"A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter."'" (*People v. Wells* (1938) 10 Cal.2d 610, 623.)" (*People v. Najera* (2006) 138 Cal.App.4th 212, 226.) Absent an affirmative showing of sufficient provocation, the trial court had no duty to instruct sua sponte on voluntary manslaughter.

Nor did the court have a duty to instruct as to involuntary manslaughter. There are no facts in the record that would support a finding that the killing was unintentional. Lister died of a stab wound to the chest, which punctured his heart, and also sustained a stab wound to the back. There was no testimony that the stabbings were accidental or that Armstrong lacked a subjective appreciation that stabbing Lister in such a manner

14

would endanger his life. To the contrary, the nature and seriousness of these injuries leaves little doubt that their infliction was intentional. The medical examiner testified it would take significant strength to stab Lister deeply enough to puncture his heart, and any speculation that the injury could have occurred accidentally is belied by the fact that Lister was stabbed not once, but twice, in different areas of his body. In the absence of evidence that the killing was unintentional, an involuntary manslaughter instruction was unnecessary. (See *People v. Parras* (2007) 152 Cal.App.4th 219, 228 [no duty to instruct on involuntary manslaughter where nature of victim's injuries indicated that their infliction did not involve a simple misdemeanor battery, but an aggravated felony assault with a deadly weapon or by means of force likely to produce great bodily injury].)

Regardless, Armstrong cannot establish prejudice. Armstrong argues that the failure to instruct on manslaughter violated his federal constitutional due process rights, under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24, that before such error can be held harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." This is incorrect. Our Supreme Court has explained: "The sua sponte duty to instruct fully on all lesser included offenses suggested by the evidence arises from California law alone. Moreover, a failure to fulfill this duty is not a structural defect in the proceedings, but mere misdirection of the jury, a form of trial error committed in the presentation of the case. Hence, by virtue of the California Constitution, reversal is not warranted unless an examination of 'the entire cause, including the evidence,' discloses that the error produced a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) This test is not met unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)" (*Breverman*, *supra*, 19 Cal.4th at p. 149.)

Overwhelming evidence established that Armstrong committed second degree murder by participating in the "beat down" of Lister, which, as a natural and probable consequence, resulted in Lister's death. The surveillance video showed Armstrong and Scott instigating an altercation with Lister and following him into the market. When

15

Scott grabbed Lister's chain and ran, Armstrong followed him and threw a punch in Lister's direction before moving out of the camera's view. Willard admitted Armstrong's involvement in the fight to a confidential informant. Johnson stated to the police that Armstrong and Scott were fighting with Lister, and did not cease fighting him until Keisha broke them apart. Immediately after the fight broke up, Lister said that he had been stabbed, and lifted up his shirt to reveal blood covering his chest. There can be little doubt that Lister was stabbed in the fight while defendant was still participating. Defendant was a Swans member, fighting alongside other Swans members. The culture of the gang provided strong motivation for him and other Swans to fight Lister to back up Scott, bolstering their own reputations and the gang's reputation. The Swans' primary activities included murder and assault with a deadly weapon. It was reasonably foreseeable that when the fight broke out at a gang hangout with numerous Swans present, another member who was armed with a deadly weapon could step in and commit murder. In light of the evidence, it is not reasonably probable that Armstrong would have achieved a better result if the jury had been instructed on either voluntary or involuntary manslaughter.

**Improper Admission of Evidence of Lowe's Prior Conviction**

Armstrong does not argue that the trial court erred in admitting evidence from Lowe's 1990 preliminary hearing that ultimately resulted in Lowe's manslaughter conviction. Instead, he focuses on what he perceives to be the likely effect of that testimony against him, despite the trial court's limiting instructions.

Proceedings

Both prior to and during trial, the prosecutor sought to have the preliminary hearing testimony from Lowe's 1990 prior conviction for manslaughter admitted pursuant to Evidence Code section 1101, subdivision (b). Lowe's counsel objected that

16

the testimony was inadmissible character evidence each time the prosecutor raised the issue. The second time the issue was raised, Willard's counsel objected that there would be "a bleed-over effect as to the remaining three defendants." He did not argue the point further. Following Lowe's testimony, the prosecutor moved a final time to have the testimony admitted, and the trial court granted the motion, and allowed the evidence to be admitted for the purposes of showing Lowe's intent to aid and abet an assault and intent to act for the benefit of a criminal street gang.

After the preliminary hearing testimony of Willie Mae McGowan was read into the record, Scott's counsel moved for mistrial on the basis that the overall prejudicial effect of the reading of McGowan's preliminary testimony violated Scott's constitutional right to a fair trial. Counsel argued that although Scott was four years old in 1990, the cases were strikingly similar. Armstrong's counsel joined in the motion, expressing concern that the prosecution would use the evidence against all of the defendants. The prosecutor responded that as she understood the issue, the jury could only consider the evidence with respect to Lowe. She anticipated the court would give a limiting instruction to that effect. The prosecutor argued that the jury was capable of understanding that none of the other defendants were involved in the 1990 incident. She offered to stipulate that they had nothing to do with the killing. Given the circumstances, there was no prejudice to defendants. Scott's counsel responded that a limiting instruction would do little to cure the prejudice. The trial court denied the motion for mistrial, stating that it would give a limiting instruction that made specific reference to the preliminary hearing testimony.

Prior to closing arguments, the jury was instructed pursuant to CALCRIM No. 304 that: "The testimony from the preliminary hearing that was read to you was admitted as evidence against Mr. Lowe. You must not consider that evidence against Mr. Armstrong or Mr. Scott." It was also instructed under CALCRIM No. 375 that it could only consider the preliminary hearing testimony "for the limited purpose of deciding whether or not: [¶] The defendant was the person who committed the offenses alleged in this case; or [¶] The defendant acted with the intent to assist, further or promote criminal

17

conduct by gang members in this case; or [¶] The defendant had a motive to commit the offense alleged in this case." The jury was instructed not to consider the evidence for any other purpose or to conclude that Lowe had a bad character or was disposed to commit crime.

In closing, the prosecutor argued, "You heard evidence when Mr. Lowe took the stand about his prior homicide. The judge just read to you an instruction about it. It was admitted for two purposes: one, to show that when any witness takes the stand and they have a prior crime of moral turpitude, you can take that into consideration when you judge the believability of the witness. There's certain crimes where the law says if you're convicted of those felonies, that the jury can take that into consideration whether or not you're a believable person. So it was offered in that sense for impeachment. The judge also offered it for another reason. That's the reason you just heard in the instruction. There are similarities between that crime and this particular crime that can cause you to come to conclusions regarding Mr. Lowe's intent and motive on that particular day because he's been in the same situation before. So while usually you don't get to consider someone's past, in this particular circumstance you can consider this regarding his intent." The prosecutor then described the similarities between the cases: both involved a large group of Swans gang members, in gang territory, blocks away from each other. In each, the victim approached alone with the intent to buy something, and a gang beating ensued. Lowe escalated the situations to murder using a deadly weapon.

While the prosecutor was making her closing argument, Scott's counsel renewed his motion for mistrial. He argued that even though the prosecutor was skillfully attempting to "put this at Mr. Lowe's doorstep," the similarities in the cases were so striking that prejudice would certainly result. A limiting instruction could not cure the harm. The prosecutor responded that her argument was narrowly tailored to Lowe and that she reminded the jury to use the prior testimony only as permitted by Evidence Code section 1101, subdivision (b) and impeachment purposes. The court denied the motion.

When the prosecutor resumed argument she addressed the issue of premeditation and deliberation of the murder: "Now, I would say, with Mr. Lowe, given we have the

18

[section] 1101[, subdivision] (b) evidence, the evidence of him committing a similar act prior, you can take that into consideration, the amount of time it takes him to make that same decision again . . . . [¶] [Y]ou can't use that evidence of the prior murder against any of the other defendants, I'm not going to argue it relates to them. They were probably toddlers when it happened."

Discussion

Armstrong does not challenge the trial court's admission of the preliminary hearing testimony from Lowe's prior conviction under Evidence Code section 1101, subdivision (b). Instead, he focuses on the strong similarity between the two crimes, and argues that the evidence should have been excluded as unduly prejudicial to the other defendants. To the extent that his argument was forfeited by failure to object to the trial court, Armstrong claims his counsel was ineffective. We hold the contention forfeited because Armstrong's counsel failed to object on the specific grounds now raised (see *People v. Jones* (2012) 54 Cal.4th 1, 61) but further conclude that counsel's performance was not deficient, nor was Armstrong prejudiced by counsel's lack of objection.

During the proceedings, the issue of whether the testimony from the preliminary hearing of Lowe's prior conviction would be admitted was raised no less than five times before the testimony was read to the jury. Armstrong's counsel did not object at any point in those discussions. Citing to the general rule that appellate courts will consider matters to which an objection was made and considered by the lower court, Armstrong argues that Willard's counsel's objection that there would be "a bleed-over effect as to the remaining three defendants" was sufficient to preserve his contention. We disagree. Setting aside the fact that Willard's trial counsel was not Armstrong's trial counsel, the objection made was not specific. Willard's counsel never elaborated beyond his single statement, or explained in what manner defendants would be prejudiced. The objection was made prior to trial, during the second discussion regarding admission of the evidence. It was never renewed. As a consequence, the trial court did not consider

Willard's objection or the effect of the evidence on the three remaining defendants prior to admission of the testimony. Armstrong's alternative argument that objection would have been futile, as evidenced by the fact that the motions for mistrial were denied, also fails. Once the concern of prejudice to the other defendants was brought to the trial court's attention, it instructed the jury that the evidence could not be used against any defendant other than Lowe. The court was clearly receptive to concerns and acted to remedy them. An objection would not have been futile. Armstrong has forfeited the challenge on appeal. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21 [defendant's failure to "make a timely and specific objection on the ground asserted on appeal" forfeits his appellate arguments based on the erroneous admission of the evidence].) Nonetheless, we review Armstrong's contention because he claims trial counsel was constitutionally ineffective for failing to object.

"The Sixth Amendment guarantees competent representation by counsel for criminal defendants[, and reviewing courts] presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703, citing *Strickland v. Washington* (1984) 466 U.S. 668, 690 (*Strickland*); *People v. Freeman* (1994) 8 Cal.4th 450, 513.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*), citing *Strickland*, *supra*, at pp. 687-694; see *Williams v. Taylor* (2000) 529 U.S. 362, 391-394; *People v. Kraft* (2000) 23 Cal.4th 978, 1068 (*Kraft*).) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' ([*Strickland*, *supra*, at p. 694]; *People v. Riel* (2000) 22 Cal.4th 1153, 1175.)" (*Cunningham*, *supra*, at p. 1003.)

"A defendant who raises the issue [of ineffective assistance of counsel] on appeal must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.'" (*Cunningham*, *supra*, 25 Cal.4th at p. 1003, citing *Kraft*, *supra*, 23 Cal.4th at pp. 1068-1069; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) The decision to object to the admission of evidence is tactical in nature, and a failure to object will seldom establish ineffective assistance. (*People v. Williams* (1997) 16 Cal.4th 153, 215.) Given the presumption of reasonableness proper to direct appellate review, our Supreme Court has "repeatedly emphasized that a claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding. [Citations.] The defendant must show that counsel's action or inaction was not a reasonable tactical choice, and in most cases ""the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged . . . .""" [Citations.]" (*People v. Michaels* (2002) 28 Cal.4th 486, 526.)

There is nothing in the four corners of the record to indicate defense counsel's motivation for his decision not to object, which is reason enough to reject the issue on direct appeal. Even if we were to conclude the issue was preserved for appeal, Armstrong fails to establish constitutionally deficient representation because there is no basis to conclude the jury considered the preliminary hearing testimony against Lowe for an improper purpose.

There was little room for doubt the stabbing occurred in the course of an assault and battery or that Armstrong both committed and aided and abetted the assault and battery. Multiple witnesses testified the attack on Lister occurred, and Armstrong was involved. Armstrong was shown throwing a punch on the surveillance video. The preliminary hearing testimony provided only a tenuous link between Armstrong and Lowe – that Lowe had belonged to the same gang as Armstrong 20 years earlier. Armstrong was not personally connected to the crime in any way. We have no reason to

21

believe that evidence admitted solely against Lowe, relating to a crime in which Armstrong was not involved, resulted in any prejudice to Armstrong, particularly because the jury had already been presented with more than ample evidence of Armstrong's guilt.

Armstrong's assertion that the prosecutor improperly used the testimony to argue generally on the natural and probable consequences theory, gang ties, and gang members acting in concert is not supported in the record. The prosecutor argued specifically that the jury could use the testimony to assess Lowe's intent and motive. She was careful to emphasize to the jury: "[Y]ou can't use that evidence of the prior murder against any of the other defendants, I'm not going to argue it relates to them. They were probably toddlers when it happened." Her statement that "[gang members] are willing to back up their homies," to which Armstrong also objects, was supported by the gang expert's opinion. It did not refer to the preliminary hearing testimony, which she had just stated could not be used in that manner, or against defendants other than Lowe.

The jury was instructed that the preliminary testimony was not to be used against Scott or Armstrong (CALCRIM No. 304), and that it could be used for the limited purposes of establishing identity, intent to assist gang members, and motive to commit the crime (CALCRIM No. 375). The testimony could not be used as evidence of bad character and the jury was not permitted to consider the testimony for any other purpose. (CALCRIM No. 375.) The jury was also instructed regarding the use of gang evidence generally that it could "consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancement and special circumstances allegations charged; [¶] OR [¶] The defendant had a motive to commit the crime charged.[¶] . . . [¶] [The jury was also permitted to] consider this evidence when . . . evaluat[ing] the credibility or believability of a witness and when . . . consider[ing] the facts and information relied on by an expert witness in reaching his or her opinion." (CALCRIM No. 1403.) The jury is presumed to understand and follow the instructions of the trial court. (*People v. Archer* (1989) 215 Cal.App.3d 197, 204.) Absent some affirmative

22

indication in the record to the contrary, we presume that it did so here. (*People v. Holt*, *supra*, 15 Cal.4th at p. 662.)

Considering the record as a whole, we conclude it is not reasonably probable that without the purported error Armstrong would have obtained a more favorable result. (See *Cunningham*, *supra*, 25 Cal.4th at pp. 1003-1004.) Counsel's failure to object did not constitute ineffective assistance.

## Prosecutorial Misconduct

### Proceedings

In rebuttal, the prosecutor argued the act of pulling Lister's chain constituted both a robbery and a battery, and could be considered to evaluate defendants' guilt under the natural and probable consequences theory of second degree murder. Armstrong's counsel objected to the argument with respect to the felony-murder rule. The prosecutor explained she intended to make the argument with respect to the natural and probable consequences theory only. The court asked the prosecutor to rephrase her argument. The prosecutor resumed rebuttal, arguing:

"The natural and probable consequence of engaging in this type of behavior, the chain yanking, unlawful touching, the fighting, the huddle, the tussle, the natural and probable consequence of any of that is that someone can die. Both of the defendants who testified admitted that can happen with ordinary people that are getting together, working together to assault someone. But even more so with gang members who are in a criminal organization for the purpose of doing so. So any sort of event where the consequence of that is dangerous to human life."

There was no objection to these statements during argument.

The prosecutor later argued: "Even if you think, for some reason, [the taking of the chain is] harmful touching, if you thought I'll pull you out of here, it's not a robbery, that's a battery. Harmful[,] offensive touching, grabbing. That you can use as a natural

23

and probable consequence.  Natural and probable consequence of that under the situation instigating a violent confrontation with someone can lead to murder."

She reminded the jurors twice after this that if they had any questions regarding the law, thought she misstated the law, or if she and defense counsel disagreed on the law, the judge was the final authority, and the jury should ask the court questions.

When the jury began deliberations, Scott's counsel moved for mistrial, arguing that the prosecutor's statements that someone "can die" or "get killed" were very different from the standard that "under all of the circumstances, a reasonable person in the defendant's position would have known the commission of the murder was a natural and probable consequence of the commission of the robbery."  The court denied the motion without comment.

Law

"The standards governing review of misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'"  [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.  [Citation.]  In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.  [Citation.]' [Citation.]" (*People v. Parson* (2008) 44 Cal.4th 332, 359.)

"""When a claim of misconduct is based on the prosecutor's comments before the jury,'""the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.""" [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427 (*Bryant*).)  "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging

rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.) "Even where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice." (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) "Under traditional application of this state's harmless error rule, the test of prejudice is whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]' [Citation.] " (*People v. Bolton* (1979) 23 Cal.3d 208, 214.)

Discussion

Armstrong contends the prosecutor committed misconduct by misstating the law regarding the natural and probable consequences theory of second degree murder in closing argument. He concedes that counsel did not object to the prosecutor's statements at the time or seek an admonition, but argues that doing so would have been futile in light of the denial of Scott's counsel's motion for mistrial. Alternatively, he argues that trial counsel rendered ineffective assistance. Both arguments fail.

With respect to forfeiture, Armstrong's argument that an objection would have been futile lacks merit. In his motion for mistrial, Scott's counsel argued that the prosecutor's burden of proof was lessened with respect to robbery, not assault and battery. Because the issue was not raised on the same specific grounds, there is no basis for believing it would have been futile.

Regarding ineffective assistance of counsel, we are again faced with a silent record with respect to counsel's decision. There are many tactical reasons that counsel may have chosen not to object. He may have believed that drawing more attention to the subject would do more harm than good, or may not have felt that the comment was objectionable, when viewed in light of the prosecution's entire argument. On this record, we cannot say that counsel's representation was deficient.

25

On the merits, Armstrong argues that the prosecution's statement that a natural and probable consequence of an assault and battery is that someone "can die" rather than be murdered lowered the burden of proof. We conclude there is no reasonable likelihood that the jury construed or applied the prosecutor's remarks in an objectionable fashion. "'''"[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]''' [Citations.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) The prosecutor was not explaining the law to the jury when she made the challenged remarks. She was arguing what could happen under general circumstances, not as laden with danger as the circumstances of this case were. Soon afterward, she argued that murder was a natural and probable consequence of assault and battery under the specific circumstances presented, in conformance with the standard. The prosecutor also admonished the jury twice that the judge was the authority on the law, not counsel, and she acknowledged that she might make mistakes or disagree with defense counsel on interpretation of the law. Viewed in the context of her rebuttal as a whole, the impact of the remarks is slight, at most. (See *People v. Dennis* (1998) 17 Cal.4th 468, 522 [prosecutor's statements must be viewed in context of her entire argument].) Additionally, the trial court instructed the jury, "You must follow the law as I explain it to you, . . . If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) The jury was also properly instructed on the natural and probable consequences theory of second degree murder with CALCRIM No. 403. Jurors are presumed to be intelligent and capable of correctly understanding the court's instructions. (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) We do not see any reason to conclude that they incorrectly applied the law.

Having failed to establish either deficiency of counsel or prejudice, Armstrong has not demonstrated counsel was constitutionally ineffective. (See *Cunningham*, *supra*, 25 Cal.4th at p. 1003.)

**Cumulative Error**

Armstrong contends that cumulative errors at trial deprived him of due process. As we have concluded that the trial court did not err, the contention necessarily fails. (See *People v. Hines* (1997) 15 Cal.4th 997, 1062.)

**Robbery-Murder Special Circumstance Sentence**

Armstrong contends that the trial court's stated imposition and stay of the robbery-murder special circumstance sentence was unauthorized and must be stricken. The Attorney General disagrees, arguing that Armstrong forfeited the issue by failing to raise it at the sentencing hearing, but that in any case Armstrong's contention is without merit. We agree with Armstrong.

The jury convicted Armstrong of second degree murder (§ 187), but also made the legally superfluous true finding that that the murder was committed while he was engaged in the commission of a robbery pursuant to section 190.2, subdivision (a)(17). At sentencing, the trial court imposed a sentence of 15-years-to-life on the second degree murder count, plus a term of 10 years on the gang enhancement (§186.22, subd. (b)(1)(C)). The court stated that it was imposing and staying sentence on the robbery-murder special circumstance, but did not pronounce a sentence.

Section 190.2, subdivision (a) provides, "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies: [¶] . . . [¶] (A) Robbery in violation of Section 211 or 212.5." By its own terms, section 190.2 is inapplicable where the defendant is convicted only of second degree murder.

"[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) "'[Such] obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings are not waivable.' [Citation.]" (*People v. Johnwell* (2004) 121 Cal.App.4th 1267, 1284.)

In this case, there is no scenario under which a sentence to life without parole or death may be imposed pursuant to section 190.2, because Armstrong was not found guilty of first degree murder. The forfeiture rule has no application to this entirely unauthorized finding. The judgment must be modified to strike the jury's true finding on the robbery-murder special circumstance.

**Joint and Several Liability**

Although Armstrong was tried jointly with Scott and Lowe, his sentencing hearing was held first, and the other defendants were sentenced on a later date. At Armstrong's sentencing hearing, on August 28, 2014, the prosecutor stated: "Your honor, I also submitted an order and abstract of judgment to the court for amounts owing to the Victim Compensation and Government Claims Board for funeral and burial expenses in the amount of $5,000. Per Penal Code section 1203.1, 10 percent is also applicable on that amount and would be joint and several liability with respect to the other defendants." The court asked if Armstrong's counsel wished to be heard on the amount of restitution, and counsel submitted. The court then stated, "I'll order the amount of restitution in the amount of $5,000 payable to the Victim Compensation Government Claims Board with interest. That amount is for funeral expenses." On the same day, the court signed an order for victim restitution in *People v. Armstrong et al.* (Super. Ct. Los Angeles County, 2014, No. BA420534), in conformance with its oral pronouncement, specifically stating that co-offenders Lowe and Scott were found jointly and severally liable. Neither the minute order of August 28, 2014, nor the abstract of judgment filed on September 3, 2014, referenced the joint and several nature of the fine.

28

Armstrong requests that the abstract of judgment be amended to reflect the court's oral pronouncement and order that the $5,000 in direct victim restitution and funeral expenses imposed be payable jointly and severally with codefendants Lowe and Scott. The Attorney General argues that the contention was forfeited because Armstrong failed to request that the abstract of judgment reflect the joint and several nature of the liability at the sentencing hearing, and because the fine contained in the abstract of judgment is not unauthorized, which would avoid forfeiture. She argues that, in any case, the issue is moot because the August 28, 2014 order is legally binding and "supplants" the September 3, 2014 abstract of judgment.

We agree with Armstrong that the issue is not forfeited. Defense counsel had no reason to believe that the abstract of judgment would not properly reflect the court's oral pronouncement at the time of the sentencing hearing, and could not be expected to object. The Attorney General cites no authority for the proposition that an order supplants a later-filed abstract of judgment.

"The abstract of judgment is not the judgment of conviction. The court's oral pronouncement controls over the abstract of judgment as the latter cannot add to or modify the judgment which it purports to summarize." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1183.) Here, the minute order and abstract of judgment do not reflect the oral pronouncement. We have authority to order the trial court to correct the abstract of judgment and minute order, and will do so here. (See *ibid*. [ordering the abstract of judgment corrected to reflect the trial court's oral pronouncement that victim restitution be payable jointly and severally].)

**DISPOSITION**

The jury's true finding on the robbery-murder special circumstance (§ 190.2, subd. (a)(17)) is stricken, and the judgment is modified accordingly. The trial court is directed to amend the September 3, 2014 abstract of judgment and August 28, 2014 minute order to reflect this modification, and to correct the abstract of judgment and minute order to

29

reflect that the $5,000 in direct victim restitution is imposed jointly and severally with codefendants Curtis D. Lowe and Sedric W. Scott.  The court shall forward certified copies of the amended abstract to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.


        KRIEGLER, J.


I concur:


        TURNER, P. J.

BAKER, J., Concurring

     I agree the trial court did not have a duty to instruct on voluntary or involuntary manslaughter under the circumstances.  I find it unnecessary, however, to reach the issue of whether defendant John Armstrong could establish prejudice from the absence of an instruction on involuntary manslaughter assuming (contrary to the evidence) the court did have a duty to instruct on that offense.

BAKER, J.